```
1                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NORTH CAROLINA
2                        WESTERN DIVISION


3


4    UNITED STATES OF AMERICA        )
                                     )
5             V.                     )   5:15-CR-363-1D
                                     )
6    SHAMIEKA GOODALL                )
     _____)
7


8                       SENTENCING HEARING
                          JUNE 6, 2017
9          BEFORE THE HONORABLE JAMES C. DEVER III
               CHIEF UNITED STATES DISTRICT JUDGE
10


11   APPEARANCES:

12   On Behalf of the Government:

13   LESLIE KATHERINE COOLEY, ASSISTANT U.S. ATTORNEY
     DENNIS M. DUFFY, ASSISTANT U.S. ATTORNEY
14   United States Attorney's Office
     310 New Bern Avenue, Suite 800
15   Raleigh, North Carolina  27601

16   On Behalf of the Defendant:

17

     DAMON JOHN CHETSON, Esq.
18   The Chetson Law Firm, PLLC
     19 West Hargett Street, Suite 900
19   Raleigh, North Carolina  27601

20   BENJAMIN HILTZHEIMER, Esq.
     The Hiltzheimer Firm, PC
21   119 Orange Street, Suite 300
     Durham, North Carolina  27701

22

23                    AMY M. CONDON, CSR, RPR
                       Official Court Reporter
24                  United States District Court
                       Raleigh, North Carolina
25          Stenotype with computer-aided transcription
```

```
 1              (Tuesday, June 6, 2017, commencing at 9:50 a.m.)

 2                        P R O C E E D I N G S

 3              THE COURT:  Good morning, Mr. Chetson, Mr.

 4   Hiltzheimer and Ms. Goodall.

 5              Is the defense ready to proceed?

 6              MR. CHETSON:  We are, Your Honor.

 7              THE COURT:  Good morning, Mr. Duffy and Ms. Cooley.

 8              Is the Government ready?

 9              MR. DUFFY:  Yes, Your Honor.

10              THE COURT:  At this time, I'd ask that Ms. Goodall be

11   sworn or affirmed.

12         (The defendant was duly sworn.)

13              THE COURT:  Ms. Goodall, do you understand that

14   having been sworn, that your answers to my questions are

15   subject to the penalty of perjury, ma'am?

16              THE DEFENDANT:  Yes, sir.

17              THE COURT:  Have you taken any kind of medicine or

18   any other substance in the last 48 hours that would affect your

19   ability to hear and understand these proceedings?

20              THE DEFENDANT:  No, sir.

21              THE COURT:  Do you know why you're here today?

22              THE DEFENDANT:  Yes, sir.

23              THE COURT:  Mr. Chetson, do you have any reason to

24   doubt Ms. Goodall's competence going forward today?

25              MR. CHETSON:  No, Your Honor.
```

1          THE COURT:  Does the Government have any reason to

2     doubt Ms. Goodall's competence going forward today?

3          MR. DUFFY:  No, Your Honor.

4          THE COURT:  Based on Ms. Goodall's answers to my

5     questions, my observations of Ms. Goodall, and the answers from

6     counsel, I find that Ms. Goodall is competent to go forward

7     here today.

8          Ms. Goodall, you're here today having been convicted

9     by a jury of two charges:  Conspiracy to commit violations of

10    the kidnapping statute and kidnapping and aiding and abetting.

11    A jury convicted you of those offenses earlier this year.

12         In light of some cases from the Supreme Court of the

13    United States, including the *Booker, Rita, Gall, Kimbrough,*

14    *Spears* and *Nelson* cases, the guidelines are no longer

15    mandatory; they're advisory.

16         Nevertheless, in accordance with those cases and

17    numerous cases from the Fourth Circuit interpreting those

18    cases, including the *Carter, Pauley,* and *Evans*, a sentencing

19    Court still must take into account the now-advisory guidelines.

20         The Court does this by initially making findings of

21    fact and calculating an advisory guideline range.  The Court

22    will then consider any motion that might be made that might

23    move that range either up or down.  I'll then consider all

24    arguments that your lawyers make, both here in court and ones

25    they already made on your behalf in the sentencing memorandum

1  they submitted, any statement you'd like to make, any victim

2  allocution, and the arguments of the Assistant United States

3  Attorney.  I'll then determine your sentence and announce it

4  here in court today.  That'll be the process we'll follow

5  today.

6          Mr. Chetson, did you receive a copy of the

7  presentence report?

8          MR. CHETSON:  We did, Your Honor.

9          THE COURT:  Ms. Goodall, did you receive a copy of

10  that report?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Did you speak with your lawyers about

13  that report?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  At this time, the Court directs that the

16  presentence report be placed in the record under seal.

17          In accordance with Rule 32 of the Federal Rules of

18  Criminal Procedure, the Court accepts as accurate the

19  presentence report, except as to matters in dispute as set

20  forth in the addendum.

21          I have reviewed the entire report, including the

22  addendum.  The addendum does contain numerous objections.

23          Ms. Goodall, you may have a seat while we work our

24  way through these.

25          Mr. Chetson, Mr. Hiltzheimer, do you want to be heard

1    on them?

2              MR. CHETSON:  I don't need to be heard on them.

3              THE COURT:  Does the Government want to be heard?

4              MR. DUFFY:  No, Your Honor, not on the objections.

5              THE COURT:  Okay.  All right.  I'm going to -- for

6    purposes of completeness, and again, in looking at the letter,

7    I'm going to go ahead and rule on them.

8              Obviously, there are numerous factual objections that

9    are overruled.  The Court does think by preponderance of

10   factual description the PSR is accurate.  To the extent there

11   were specific objections to certain enhancements, I will rule

12   on those now.

13             The first objection is a six-level offense

14   enhancement under Section 2A4.1(b)1 for ransom demand or demand

15   upon the Government.  Section 2A4.1(b)1 applies "If a ransom

16   demand or demand upon Government was made."

17             The guidelines do not define the term "ransom" but

18   the Fifth Circuit has adopted the Merriam Webster definition

19   that ransom is "Consideration paid or demanded for the release

20   of someone or something in captivity."  The *United States v.*

21   *Fernandez*, 770 F.3d, 340, 343 (5th Cir. 2014).  This is

22   essentially the same definition that Black's Law Dictionary

23   contains.

24             The text message demanded that Stephanie, who was

25   Melton's state defense attorney, buy a pack of Newport

cigarettes, unwrap them and smuggle them into prison and that
Stephanie and another person should correct the error of
imprisoning him and fix this problem or else we'll start
killing you family and we'll start with you father.  The text
messages then clarified if you follow my instructions and
everything go good, we let your father go.

          In context, the Court finds that the text message is
clearly demanding consideration for the safe return of
Mr. Janssen.

          The Court also finds in the alternative that the text
message represented a demand on the Government.  The text
message asked the Assistant District Attorney to fix the
problem of Melton's supposedly unjust imprisonment.  The record
shows that the timing of the text messages and kidnapping
around April 7, 2014, suggested that the kidnapping was
motivated by deadline for filing a petition for discretionary
review with the Supreme Court of North Carolina.  The deadline
was April 22nd, 2014.

          Section 2B1.1B provides that acts taken within the
scope or jointly undertaking criminal activity and furtherance
of that criminal activity are to be considered.

          Here, the Court does find that this conduct was
reasonably foreseeable in connection with the criminal activity
for which the defendant has been convicted, therefore, the
enhancement applies.

1    The Second Circuit recently applied the standard

2  enhancement in a case called *U.S. v. Acevedo*, 824 F.3d 179, 185

3  (2nd Cir. 2017).  So that objection is overruled.

4    Section 2A4.1(b)(2)(A) provides a four-level

5  enhancement if the victim sustained permanent or

6  life-threatening bodily injury.

7    Permanent or life-threatening injury means injury

8  involving a substantial risk of death, loss or substantial

9  impairment of the function of a bodily member or mental faculty

10 that is likely to be permanent or an obvious disfigurement that

11 is likely to be permanent.

12    In the case of kidnapping, for example, maltreatment

13 to a life-threatening degree, e.g., by denial of food or

14 medical care would constitute life-threatening bodily injury.

15 See the commentary to the guideline.

16    The definition is disjunctive, it encompasses both

17 severe injuries that may not be permanent and permanent

18 injuries that may not be severe so long as the injuries are

19 substantial.  See *United States v. Price*, 149 F.3d 352, 354,

20 (5th Cir. 1998).

21    Here, the -- certainly the depravation of food and

22 water to the point Mr. Janssen hallucinated from dehydration

23 was maltreatment to a life-threatening degree and the blood

24 clot and permanent scars that Mr. Janssen sustained constitute

25 direct degree of substantial injuries.

1    Again, the Court does find that these activities were

2  taken within the scope of jointly undertaking criminal activity

3  and in furtherance of that criminal activity, the Court finds

4  that the horrific maltreatment of Mr. Janssen was reasonably

5  foreseeable in connection with this criminal activity in light

6  of Ms. Goodall's conduct; therefore, the enhancement applies.

7  See generally, *U.S. v. Acevedo*, 824 F.3d, 179, 185 (2nd Cir.

8  2017*), United States v. Davis*, 19 F.3d 166, 171 (5th Cir.

9  1994).

10    I do find that she knew of this horrific maltreatment

11  given her role in the kidnapping and her connection with the

12  kidnappers, including Melton, Maynard and Martin and others.

13    Paragraph 87, probation applied a two-level

14  enhancement under Section 2A4.1(b)(3) for the use of a

15  dangerous weapon.  The enhancement applies if a firearm was

16  discharged or a firearm or dangerous weapon was otherwise used

17  as those terms are defined in the guidelines.

18    Section 2A4.1 Comment Note 1 states that a dangerous

19  weapon is an instrument capable of inflicting death or serious

20  bodily injury or an object that is an instrument capable of

21  inflicting death or serious bodily injury but closely resembles

22  such an instrument, or the defendant used the object in a

23  manner that created the impression the object was such an

24  instrument.  Comment Note 1(D) to Section 1B1.1.

25    A dangerous weapon is otherwise used if it is not

discharged but was used beyond mere brandishing, displaying, or possessing. *United States v. Young*, 87 F.3d 1310, the Fourth Circuit held that a stun gun used to incapacitate or threaten victims or bystanders would qualify as a dangerous weapon under the guidelines. See also *United States v. Quiver*, 805 F.3d 1269, 1272-1273 (10th Cir. 2015) and *U.S. v. Allen*, 561 F.3d 364, 375-376 (6th Cir. 2008).

Here, the defendant's co-conspirators used the taser, stun gun on Mr. Janssen to incapacitate him in his home. He also was struck on the head with the butt of a firearm. He also was tased repeatedly in the car.

This conduct qualifies under the guidelines and was within the scope of jointly undertaking criminal activity and in furtherance of that criminal activity.

In light of the evidence presented at trial, this Court finds that the conduct was reasonably foreseeable to Goodall that the co-conspirators engaged in this kidnapping would use a dangerous weapon to subdue the kidnapping victim. See *U.S. v. Acevedo*, 824 F.3d 179, 185 (2nd Cir. 2017), thus this enhancement applies.

There also is an objection to the sixth-level enhancement under Section 3A1.2(b) for a crime committed against an official victim that was motivated by the victim's status because the defendant allegedly lacked knowledge of the identity of the victim or the fact that the victim was related

1   to a public official or that a public official was the intended

2   target of a plot.

3           The enhancement applies if the, "Victim was a

4   Government officer or employee or a member of the immediate

5   family of a Government officer or employee and the offense of

6   conviction was motivated by such status.  See Section 3A1.2(a)

7   of the guidelines.

8           The enhancement is a six-level enhancement if the

9   offense of  conviction was an offense against the person, as

10  that phrase is used in Chapter 2, Part A of the guidelines.

11  See Section 3A1.2(b) of the guidelines.

12          The guidelines do not define what family members

13  count as "immediate family".  The Court notes that Black's Law

14  Dictionary defines "immediate family" to include a person's

15  parents.

16          Mr. Janssen, the victim, was targeted, kidnapped and

17  held for ransom because he was the father of Colleen Janssen, a

18  Government official, Assistant District Attorney in Wake

19  County, thus the objection is overruled.

20          Moreover, the Court does find based on the evidence

21  presented at trial that Ms. Goodall had the requisite knowledge

22  and that also this enhancement should apply based on her

23  knowledge of this fact during the course of the kidnapping.

24  She certainly knew that that was the DA's father who was being

25  held.

1          So that objection is overruled.

2          For purposes of *Booker* and its progeny, then, the

3    Court finds the Total Offense Level to be 43, and Criminal

4    History Category to be 1, the Advisory Guideline Range to be

5    life imprisonment.

6          Does the Government object to that advisory guideline

7    range?

8          MR. DUFFY:  No, Your Honor, we do not.

9          THE COURT:  With the objections preserved, does the

10   defense object to that advisory guideline range?

11         MR. CHETSON:  No, Your Honor.

12         THE COURT:  I'll hear first from Mr. Chetson and Mr.

13   Hiltzheimer, and then I'll hear from Ms. Goodall, and then I'll

14   hear any victim allocution and then I'll hear from Mr. Duffy.

15         MR. CHETSON:  Yes, Your Honor.  I'll be brief.  We

16   filed a sentencing memorandum, which I'm sure Your Honor

17   viewed.

18         THE COURT:  I have.

19         MR. CHETSON:  In addition, we filed a report provided

20   by Cindy Cottle, a forensic psychologist who interviewed our

21   client on numerous occasions and conducted a series of

22   psychological examinations of our client.

23         I'll say briefly a couple things about Ms. Goodall

24   and then turn to the offense conduct.

25         First would be as the report in our sentencing

memorandum indicates, Ms. Goodall faced not only a poor

upbringing, but an upbringing characterized by abuse, physical

and sexual abuse, characterized by a lack of connections with

any real family.

The report indicates that at a very young age

Ms. Goodall was essentially removed or kicked out of her

mother's -- biological mother's household in light of tensions

and what she perceived as racist conduct by the stepfather.

And that as a result of that, she lived in a number of foster

homes before eventually being adopted by a social worker.  And

she was adopted in her early teens by the social worker,

Ms. Marshal Goodman.

And following that, given that she had been adopted

at a fairly old age, the relationship between her and her

now-adopted mother was not good.

And so several years later she was -- ran away.  She

lived for a period of time on the streets in Broward County.

She met a man who was her senior and that either initially or

over time developed into a very abusive relationship.  So much

so that she tells us that his mother advised her to get out of

the relationship, to seek help at a woman's shelter because she

might end up dead.  She did get out of the relationship.

During this time, she was working in legitimate

professions, legitimate jobs as a clerk at convenient stores in

Florida.  That was sporadic, however, and she reports also a

history of working as an escort.  And the report documents
various abuses that she suffered through that conduct.  She is
ashamed of that and that took some time for her to reveal to
the psychologist and also to, frankly, us as attorneys.

With that having been said, looking for a connection
with her stepbrothers, she moved to Georgia.  And what we would
say from the report is that Shamieka, as the test indicates
that Dr. Cottle performed, that Shamieka suffers from a
detachment or a need to feel as part of -- as though she was
part of a community or family.

And Your Honor has sat through probably hundreds,
maybe thousands of sentencing involving gang members and knows
that gangs present themselves as a way of providing a community
or a family.  It's a false family and a false community, but a
way of providing that to people from very difficult
backgrounds.

And we would contend that that's in part what
happened here.  Notwithstanding the conduct, the jury found our
client guilty of, that's what happened.

Your Honor has also had the opportunity to preside
over Mr. Melton's trial and to hear Mr. Melton testify, to hear
him make statements to this Court and to hear testimony about
how Mr. Melton was a problem in the North Carolina jails where
he was being held pretrial prior to his State trial, and in
North Carolina Department of Corrections, not just with respect

1    to the use of cell phones through that, but through his ability

2    to attract people into his gang and we would contend that while

3    to the extent that the jury found that she was a member of this

4    gang, to the extent there was evidence, that she joined the

5    gang, that she is responsible for that conduct, but that a

6    large part of that was driven by Mr. Melton and that her desire

7    was to find a family or a sense of belonging which she lacked

8    much of her childhood and that compelled her to join the gang.

9         Now I'd like to move -- I'm not going to say

10   everything that's in the report because you've had an

11   opportunity to read that and it's part of the record.  But I'd

12   like to talk a little bit, notwithstanding you overruled our

13   objections, about the conduct of the other individuals in this

14   case.  I was here for the sentencings and I've seen the

15   sentencings of Qauntavious Thompson, Tianna Maynard, Jakym

16   Tibbs and the other individuals who were involved.

17        Your Honor is well-aware having sat through two

18   trials that from the Government's evidence that Ms. Goodall was

19   not present during any actual specific conduct; that is, the

20   very violent beating of Mr. Janssen, violent acts that resulted

21   in his abduction and the way he was treated, and those are

22   particularly horrific facts.

23        I've been practicing for about 10 years and they are

24   the most horrific facts that I've ever seen in a case; that I

25   personally handled and they are egregious, and we are not

1  trying to gainsay those facts.

2          What we are saying is that Ms. Goodall's conduct was

3  different in kind from the conduct of the other co-conspirators

4  who were present physically at various locations where the

5  conduct happened, who hit and struck Mr. Janssen, who knew

6  specifically because they were in the home in southeast Atlanta

7  with him, the conditions he was facing, had the opportunity to

8  get him food and water and did not do so.  Who saw him with his

9  hand swelled and his body suffering and did virtually nothing

10  to help him, and then with respect to Mr. Roberts, procure the

11  pick and the shovel to dispose of the body.  Ms. Goodall was

12  not present.

13          Now, when the Government's evidence and when the

14  evidence accepted obviously by -- and decided by this jury, but

15  for Ms. Goodall's conduct as part of the conspiracy, this may

16  not have occurred or would not have occurred depending on how

17  you view that conduct, which is that she provided money.  And

18  that when the Government's evidence facilitated the connection

19  between Jenna Martin and the rest of the conspirators and at

20  some point during the conspiracy had contact with conspirators

21  and perhaps assisted them in identifying the locations in

22  southeast Atlanta.  Your Honor of course understands that we're

23  saying that with respect to what the Government has shown.

24          That having been said, we understand the Court's --

25  what will be the Government's contention, we expect that, but

1    for her conduct that may not or likely would have not occurred

2    because providing the money was an important part of what the

3    Government contended and showed was the conspiracy.  That is

4    different in kind from the conduct committed by the other

5    individuals.

6         And so we would ask you to sentence Ms. Goodall

7    consistent with all those principles in 3553(a).  And I made

8    some other sorts of arguments in the sentencing memorandum

9    about the idea behind general and specific deterrence, which

10   I'm sure Your Honor is well-aware of.  We would contend that

11   the literature tends to show that confidence in prosecution and

12   conviction is more important than length of sentence.

13        She understands that having been involved in this

14   conduct, as the Government has alleged, that she is going to

15   suffer a very serious sentence today.  We would simply ask that

16   there be a chance at the end of that sentence that she see

17   daylight.

18        So consistent with the other individuals, we would

19   ask for a 360-month sentence.  That is more than Jenna Martin;

20   that is, if I'm recalling correctly, similar to Ms. Kramer;

21   that is less than Tianna Maynard, who engaged in much more

22   egregious conduct.  So we would ask that that sentence be

23   imposed upon her.

24        We would also ask that in terms of a

25   recommendation -- we understand that the Court is likely to

separate out these defendants in the southeast.  We would ask

for a location in the southeastern part of the country.  She

doesn't have a specific location in mind, we talked about that.

Southeast of the United States.

          We would ask for -- as the report indicates, there

was heavy marijuana use, we would ask for drug treatment and

she would also ask for the opportunity to obtain her GED and

any other skills or education available to her in the Bureau of

Prisons.

          THE COURT:  At this time I'll hear from Ms. Goodall,

if you'd like to make a statement, ma'am.

          THE DEFENDANT:  No, sir.

          THE COURT:  I'll hear from Mr. Duffy, I'll hear the

victim allocution, whichever order you want to do it.

          MR. DUFFY:  Your Honor, we have two victims that will

be allocuting.  And, of course, victim allocute from Mr. Frank

Janssen and he'll be followed by Colleen Janssen.

          MR. JANSSEN:  Thank you, Your Honor, for this

opportunity.  Thank you for all your work, your patience and

your legalese interpretations.

          It's been more than three years since the kidnapping.

You might think that's both a long time.  I know it seems that

way to my family, my extended family and everyone who knows me.

          However, to me it's like it happened yesterday.  The

time I spent in the closet seemed like an eternity.  The

1    numbness in my hands and feet are constant reminders along with

2    the daily tragic events around us, our communities, around the

3    world.  What I went through pales in comparison to those

4    events, yet they constantly remind me and refresh my memories.

5    They continue to have a sobering effect on me while at the same

6    time make me feel extremely grateful.  Grateful for the efforts

7    of law enforcement at all levels.  Without each and every one

8    of them doing their part, I would not be here today.

9            Without the diligence, the thoroughness and

10   follow-through and the analysis of everything, especially

11   Stephen Jessup and his crew, we would not be able to bring

12   justice to all these people who were involved in this crime.

13           And also, finally, without the skills, the

14   organization and the presentation of this case by Leslie

15   Coolie, Dennis Duffy, and his staff, we would not be completing

16   this final phase.

17           I'm not the kind who dwells on the past too much

18   except to understand it and learn from it.  But with this

19   kidnapping, I am constantly thinking about it, aware of it, and

20   reminded how quickly things can change.  I've had lots of time

21   to think and rethink about everything.  I've had to relive the

22   excruciating details during each of these trials and it never

23   got easier.

24           I'm overwhelmed by the impact it had on all my family

25   and friends as well as all that they've had to endure through

it all.  I thank them all for their support.

I continue to speculate on your motivation, your actions, your behavior.  I don't have a single answer.  Certainly, not one good.  Well, one that would justify what you did.

Try as I might, I cannot understand why anyone would risk losing their freedom, in essence their life, unless for a greater cause such as God and country, and we have so many in our military and our first responders that do that to protect us.

So what was your cause?  Was it worth your freedom?  Was it the money?  The power?  The status?  Did you consider the consequences of your actions?  My guess is that you didn't.

You didn't consider Mr. Curtis, you befriended him and in return he provided you with transportation, assistance with moving money, food, friendship.  You didn't shoot him, but you may have well done so.  You outed him for potential of weapons, status, power.  Lucky for him, he, too, survived.

Likewise, you didn't grab me.  You didn't tie me up.  You didn't lock me up, but you may as well done those things, you enabled all that; the power, money, status, they all drove you to this path.

Did you even think for a moment to ask yourself if this was the right thing to do or why?  Perhaps you had a chance to think about that already or perhaps you're still

1    thinking about it.  And maybe you do have an answer.

2            Hopefully, with this sentence here, you and others

3    faced with similar circumstances will make a better decision in

4    the future.

5            Thank you.

6            THE COURT:  Thank you, Mr. Janssen.

7            MR. DUFFY:  Your Honor, Colleen Janssen.

8            MS. JANSSEN:  Good morning, Judge.

9            THE COURT:  Good morning.

10           MS. JANSSEN:  I, once again, I find myself in a

11   position of believing that I don't know that I can say anything

12   better to you than what my parents just said, so I'm going to

13   take a moment to brag.

14           My parents are amazing people.  My father has been my

15   hero since I was a little kid and my mother became equally my

16   hero during all of this and I could not be luckier.  I

17   shouldn't have ever had to consider how lucky I am to get up

18   every morning and have both of them, although I should every

19   day, we all should.

20           I would just ask you to -- when you hear arguments

21   that this defendant did not do any of the things herself that

22   caused so much physical harm to my father, she managed to do

23   that because she ingratiated herself enough that she didn't

24   have to get her own hands dirty and she got to send other

25   people out and help them do it.

1          Please take that into account and hold her

2     responsible as I know that you will during all of these

3     sentencings and put her in the right place for having hurt my

4     heros.

5               THE COURT:  Thank you.

6          At this time I'll hear from Mr. Duffy on behalf of

7     the United States.

8               MR. DUFFY:  Thank you, Your Honor.

9          The defense argues that Shamieka Goodall, a/k/a Mieka

10    Diva is somehow a victim in this case; that her need for

11    acceptance somehow made her susceptible to gang manipulations.

12    On page 8 of that psychological evaluation, she goes as far as

13    blaming Jenna Martin for introducing her to the gang.

14         Your Honor, the facts which we presented as evidence

15    make it abundantly clear that's a flat-out lie, the same she

16    made to her evaluators are flat-out lies.  Jenna Martin did not

17    introduce her to gang members.

18         On page 5 and 6 of that evaluation, she indicates to

19    the evaluator that she met Mr. Melton through a dating service

20    in January of 2015.  That's a lie.  She also indicated she

21    didn't learn that Mr. Melton was in prison until March of 2016;

22    that's a flat-out lie, no two ways about it.

23         When you take the full measure of Shamieka Goodall's

24    involvement in this gang, it's not a question of her seeking

25    acceptance; that's not what she was doing.  She was seeking

advancement.  And she was willing to get that advancement at
any price.  Willing to do anything, even violence.

This fact was shown again, again, again, by
indisputable facts.  No suggestions the defense said that we
might have proven this, we might have proven that.  The facts
speak for themselves.

It's indisputable at least by February 7th, 2014,
Shamieka Goodall joined this gang.  How do we know?  Because
she sent a picture of herself with Tianna Maynard to Mr.
Melton.  It was a picture of her sitting in the New Town Circle
apartment where a couple months later Frank Janssen would be
held in a small closet on the second floor.

Then we go on from February 7th.  We know about this
day, she's in the breadwinner lineup.  How do we know?  Fact.
We know because we looked at the notebook Tianna had.  She's
listed in the breadwinner lineup.  Nothing to do with Jenna
Martin.  Jenna Martin doesn't even know these people exist yet.
She hasn't been called in to be a driver yet.  That all
happened in early April.

Go to February 10th, three days later, we got toll
records where she's communicating with Dewayne Seymore a/k/a
Shooter.  So she's already branching out and talking to
Shooter.  This isn't someone meekly joining a gang in the
breadwinner line several rungs below Maynard and just trying to
fit in quietly.  This is someone within days reaching out and

1    communicating with higher ranking male gang members.

2         February 16, 2014, we have a text message from Tianna

3    Maynard to Roberts, the head of the male line of the gang in

4    Atlanta, saying Diva needs to talk to you ASAP.  Except they

5    don't use ASAP, they use DG SAP because it's Don G.

6         A week later, February 23rd, Goodall sends photos of

7    herself in negligees and whatnot directly to Mr. Melton.  So so

8    much for the chain of command.  It has taken her two weeks to

9    jump the chain and get direct communications with Melton.

10        Basically, she's not seeking acceptance; she's

11   seeking advancement and she's going to get it quicker.  That's

12   February 23rd.

13        At least by February 24th, she starts to groom Curtis

14   Parrott, Curtis Parrott was the victim in Covington who she met

15   when she worked at a convenient store.  How do we know at least

16   February 21st she's grooming him as a potential victim down the

17   line?  Because he sends her a money-gram.  We have it.  It's

18   Exhibit 178.  And again, that's February 24th.

19        Then we go to March 1st, 2014.  By this point, she's

20   involved in money-grams.  How do we know that?  Western Union

21   transfers.  Because we introduced copies of the Western Union

22   Transfers between Shamieka Goodall and Patricia Kramer.  That's

23   Exhibit 323 and 324.

24        Then we get a couple weeks later, March 9th through

25   12, this is the Louisiana attempt.  At some point in the

1   lead-up to the Louisiana attempt, there was some agreement for

2   her to watch the children.  How do we know?  Because there's a

3   text message.  When it falls through, Shooter alerts the

4   children that says Diva is boming, instead of coming, because

5   they can't use "C" because of the Crips, coming to get them.

6   That's on March 10th.

7           March 11th, while Tianna is in the middle of this

8   mission, they take time for a 23-minute phone call between

9   Tianna and Shamieka Goodall.  How do we know that?  We know it

10  because of records, Exhibit 413A, page 9.

11          Then we go to March 15th when they come back.  At

12  this point, they are trying to set up the High Point mission.

13  When they thought it was some relative of Stephanie Curtis that

14  they were going to kidnap, they were having trouble getting a

15  car, a mess up, kept getting delayed.  At this point we have a

16  text message from Shamieka Goodall to Mr. Melton saying, Sorry

17  I messed up the move.  I never want to be the reason you're not

18  coming home.

19          At this point it's abundantly clear she's in on the

20  plans.  If this was going to be a drug deal that she was

21  helping them with, it wasn't going to let him get home.  Some

22  ill-conceived extortion plan that we all know is never going to

23  work, but it was something he was going to try, Mr. Melton.

24          Couple days later we have Curtis Parrott.  This is

25  where you really start to understand the makeup of Shamieka

Goodall.  She brings this guy in and starts having a romantic

relationship with him.  She goes out to his location, she

starts to befriend him, she starts to groom him in a way.  He

doesn't understand that he's being set up as a target that she

can use for potential advancement.

What happens on March 15th or thereabout?  Well, we

know what happens.  She, along with two colleagues or gang

members, go to the location, they rob him, he gets away, as

he's running away, they shoot him in the back.  He's knocked

down, they bring him to the hospital.

I think it's very telling the e-mails -- or the text

messages, not e-mails -- that she says to Roberts right after

the shooting, this is at Exhibit 378A, page 55, again, this is

a fact, there is no two ways about it, it's in black and white

right here in the exhibit.  How does she respond?  This is it,

I'll quote it.  How bad was it?  Shit.  They just picked his

ass up at 320.  Pigs out and all right now.  Donna GZ.  And

then she continues and says, Is he X'd out?  This is a guy she

had a relationship with.  She's talking tough, using X'd out.

The next day the police come to talk to her.  We

heard the audio or portions of that interview where she's like,

oh, my gosh, I can't believe he's hurt.  I feel so bad for him.

Can I visit him at the hospital?  They talked to her.  She

basically is very polite.  She talks to him about concern for

this guy.  As soon as they leave, what does she say to Clifton

1   Robert, again 378A, page 55, Books up, Yee, Yee is Clifford

2   Roberts, the word on the dude he's in surgery now.  Four

3   investigators came up to where I worked.  Then she indicates I

4   already told Dizzy when it happens, I'll be the first person

5   they come to.  This is someone deeply involved in a gang and

6   she's more than willing to put Curtis Parrot's life on the line

7   if it's going to get her advancement.

8        Your Honor, that moves forward fairly quickly to

9   March 31st, 2014.  The text messages that she sends to Mr.

10  Melton saying, Do you still need a driver?  No two ways about

11  it.  She's setting up the driver, Jenna Martin, who's going to

12  be used to kidnap Mr. Janssen.  She's way more than a but-for

13  person in this case.  She's deeply involved in this gang and

14  more than happy to commit violence if it's going to get her

15  some chance of advancement.

16       April 1, 2014, she indicates to Mr. Melton, Soon I'll

17  have you home to myself.  At this point, she also in the --

18  couple text messages down asks for a soul catcher, which we

19  know now from the gang lingo is a gun.

20       Then we get late evening of April 4th, going into

21  Saturday morning, April 5th, 2014, she allows the gang to stage

22  at her Covington house, same thing they did before they went to

23  get Parrott and shoot him in the back.  She provides them with

24  money.  They have a conference call with Mr. Melton.  They use

25  the money to get gas, to get clothes, to buy zip ties, to get

food on the way over.  They go ahead and kidnap Mr. Janssen late in the morning on Saturday, April 5, 2014.

On the way back, the location falls through.  And if you look at her toll records and Mr. Melton's toll records, she, among many other people, were all about trying to find a backup location to put Mr. Janssen.  Where is it?  It ends up being at New Town Circle Apartment that she sent that picture to Mr. Melton or the one she was in with Tianna Maynard.

During the time that Mr. Melton is being --
Mr. Janssen is being held, we have communications with Jenna Martin that she's on the text message with, also calls.  And then the morning after Mr. Janssen is freed by the FBI, we have calls between Shooter or Dwayne Seymore and the defendant talking about what happened, who is arrested.  This is a person deeply involved in gang life and fortitude of gang life.

The bottom line with regard to Shamieka Goodall is she is not a victim.  She's a predator.  And her MO, she looks for her opportunity, she exploits it, and she has no qualms about violence.  We saw this with Curtis Parrott.  That's the history, that's the circumstances of Ms. Goodall that you should take -- we would argue that you should take in mind when you're looking to fashion a sentence for her.

The nature and circumstances of the crime:
Obviously, it's a heinous, violent crime.  The impact on the family I can't say any better than Mr. Janssen.  It's always

going to seem like this thing happened yesterday.  It is going
to be a life-defining moment.  I'm just a prosecutor on the
case, and I can't stop thinking about that moment.  Whenever I
see April 5th creep up, I know that's the day of the robbery.
I know the date June 6th, that's the day we started the trial
last year.  It all falls in like that.  It's like that for me
and I was just a peripheral player.

As far as the seriousness of the crime, Your Honor,
we would suggest to you that in addition to Mr. Janssen himself
as you've seen again and again and again by support of the
Janssens in attending his trial, testifying and allocuting,
this thing hit their whole family, not just Mr. and
Mrs. Janssen, but their children, their extended family, the
family here that they have supporting them.

As far as the promote respect, that factor that we
look at under 3553(a), I don't think it could be understated
the impact this kind of case has on the criminal justice
system.  The way the criminal justice system works in this
country, as we all know, is we have prosecutors and we have
defense counsel and we do our job and then the jury speaks and
then we listen to what the jury says and that's the verdict.
We all live with it.

The impact that a case like this has is that
prosecutors, defense attorneys, you know, this is the kind of
case that they look at that makes them wonder maybe a little

bit about how do I do my job if they are going to start putting

hits out on us?  We are not that kind of country.  We have a

justice system that's firmly established.  We are law and

order.  We have a jury system.  The jury speaks and go by what

the jury says.

Your Honor, as far as just punishment and how the

defendant fits in with everybody else, every other defendant in

this case, with the exception of Mr. Seymore, was looking at a

guideline range of life.  Everybody.  Mr. Seymore wasn't, not

because he wasn't a violent guy, but he was old enough to

understand after Warren Robbins in January of 2014, he's like

I'm not going to do what this guy on the phone says and do

murders in broad daylight.  He jumped off and tried to form his

own line of gang, whatever subsect it was going to be.  He was

going to continue doing crime, but he separated himself from

the gang.  As a result, he didn't get the six-level enhancement

for the victim.  Every other person in this case faced life.

Regardless of what their connection was to the case, some faced

a little more than life if there was a gun charge.

The difference between the defendant and many of

these people, she chose to go to trial and not cooperate.

That's why those other people got less than life.

Your Honor, at the end of the day, with regard to

Shamieka Goodall, it's the Government's position and one of the

facts we look at is protecting the public interest, I believe

she's a predator, I think she's dangerous, I think she's

manipulative. You just have to look at Curtis Parrott to

really understand a lot about this woman.

As a result, Your Honor, we think the guideline range

in this case of life is warranted and request a sentence of

life.

Thank you, Your Honor.

THE COURT: Mr. Chetson?

MR. CHETSON: I don't have anything further, Your

Honor.

THE COURT: Thank you.

Ms. Goodall, the Court recognizes its obligation to

impose a sentence sufficient, but not greater than necessary,

to comply with the purposes set forth in the statute.

I have considered all arguments that your lawyers

have made both here in court and in the sentencing memorandum

they submitted. I have considered the position of the United

States. I have considered the advisory guideline range.

Among other things, I'm to consider the nature and

circumstances of the offense and the history and

characteristics of the defendant; the need for the sentence

imposed to reflect the seriousness of the offense, to promote

respect for the law and provide just punishment.

The need for the sentence imposed to deter others who

might chose to engage in the criminal behavior that brings you

here; the need for the sentence imposed to protect the public
from further crime by you; the need for the sentence imposed to
provide you with needed educational, vocational training or
medical care in the most effective manner; the need to avoid
unwarranted sentencing disparities.

The Court has considered all the other factors listed
in the statute, although I won't mention each one individually.

As for the nature and circumstances of the offense,
the jury convicted you of two offenses: Conspiracy to commit
violations of the kidnapping statute and kidnapping and aiding
and abetting. The crimes in your criminal conduct in
participating in the crimes were horrific.

The report recounts and referred both in the trial
and today during argument the horrific nature of the kidnapping
plot that you participated in in connection with kidnapping
Mr. Janssen with the goal of getting Mr. Melton released from
prison so that you could be more than his "wifey," which my
memory is what he had you listed as on his phone, so that you
can be together as part of the gang.

Mr. Janssen was viciously abducted from his home by
the four people who went there, including Jenna Martin who you
recruited into the kidnapping plot. They staged at your
residence in Covington and you provided $200 to them which they
used for food and travel expenses to get to Wake Forest in
order to kidnap Mr. Janssen.

1          You, I think the evidence shows, were involved in

2    phone communications trying to find a different spot to hold

3    Mr. Janssen.  You absolutely knew it was a kidnapping.  You

4    were all in once you got into this gang.  You were very

5    cognizant of the New Town Apartment having lived there for a

6    time with Ms. Maynard in early February, 2014.

7          The report recounts the events moving forward,

8    including the plot in Louisiana where you're on the phone with

9    Maynard during the course of that.  I recognize that the jury

10   didn't find that for purposes of an object, but I think it's

11   ludicrous to think that you didn't know exactly what Maynard

12   was doing in Louisiana when you were on the phone for 20

13   minutes during that plot.

14         You set up Mr. Curtis Parrott and participated in

15   that vicious attack and assault as part of gang life and to get

16   guns, to further the interest of the gang using the same modus

17   operandi.  Miraculously he survived after being shot in the

18   back.

19         You did get interviewed by the police and they did

20   release you, but you were in immediate text communications with

21   your fellow gang members and that didn't slow you down because

22   those events all preceded the kidnapping conspiracy

23   leading to Mr. Janssen's abduction where, again, you assisted

24   in providing money, staging, and then finding a different

25   location and then in constant communication during and after

1    it, you knew full well everything.

2            As for your history and characteristics, I have read

3    the report.  I do think it's fair to say there were some

4    inaccuracies in terms of the information that the psychologist

5    received from you about your relationship with certain people,

6    but I do recognize, as Mr. Chetson pointed out in his memo, the

7    hardship that you endured as a child with your biological

8    mother and notwithstanding the efforts of your adopted mother,

9    your inability to get along with her and then you're ultimately

10   leaving and looking for some sense of belonging and not just

11   belonging at some low level, but to be a gang wife to the

12   founder, Mr. Melton, was an important thing to you for whatever

13   reason.

14           I do think it's important that the sentence promote

15   respect for law.  This is a crime that I think strikes at the

16   very heart of our justice system, both with respect to

17   prosecutors and defense lawyers and the justice system in

18   general, an attack essentially on the rule of law that you were

19   very comfortable participating in is an attack that needs to be

20   punished and it will be today.

21           I have taken into account the sentences of others.

22   Others did cooperate.  These principles have been discussed

23   before, again, in a kidnapping case *U.S. v. Acevedo*, 824 F.3d

24   179, 186 (2nd Cir. 2017) noted issues associated with the

25   difference of those who cooperate and that being something that

1  makes disparities not unwarranted.

2          Here, I don't think you're similarly situated with
3  the others.  I think you were at a sufficiently high level
4  given your relationship with Melton; that you didn't have to go
5  do all these things, but that you were all in.  You were all in
6  and all about it.  And I reject any suggestion otherwise.  You
7  wanted him home to be with you and were going to do whatever it
8  took and have him endure whatever he had to endure to make that
9  happen.  And I don't think there is an unwarranted sentencing
10 disparity between the sentence you will receive today and the
11 sentence that others have received.

12         I do think -- and I read the studies, I'm very
13 familiar with them, on topics of general deterrence; and here,
14 I do think specific deterrence is critical.

15         I think Ms. Goodall is accurately described as a
16 predator, someone who needs to be incarcerated and society
17 needs to be protected from today and will be in light of the
18 horrific nature of her criminal behavior, the need to provide
19 just punishment, the need to promote respect for the law, the
20 need to be incapacitated.

21         Having fully considered the entire record of the
22 case, pursuant to the Sentencing Reform Act of 1984 and in
23 accordance with the Supreme Court decision of *United States v.*
24 *Booker*, it's the judgment of the Court that defendant, Shamieka
25 Goodall, is hereby committed to the custody of Bureau of

Prisons to be imprisoned for a term of life on each count to be
served concurrently.

Upon release from imprisonment, the defendant shall
be placed on supervised release for five years.  This term
consists of five years on Count 1 and five years on Count 3 to
run concurrently.

Furthermore, she shall comply with the mandatory and
standard conditions as well as the following additional
condition:

She'll participate in a narcotic addiction treatment
program, mental health treatment program, consent to a
warrantless search, cooperate in the collection of DNA.  She'll
pay a special assessment of $200, which shall be due
immediately.  If she can't pay immediately, she'll pay through
the Inmate Financial Responsibility Program in the amount of
$25 per quarter.  I'm not going to impose a fine.

In accordance with counsel's request, I recommend
that she serve her sentence in the southeast United States.  I
recommend that she be kept separate from all other
co-defendants within the Bureau of Prisons.  I recommend
intensive substance abuse treatment.  I recommend mental health
treatment.  I recommend vocational and educational
opportunities.

I do think I properly calculated the advisory
guideline range.  I announce pursuant to *U.S. v. Gomez-Jimenez*,

1    750 F.3d 370 (4th Cir. 2014) and *U.S. v. Hargrove,* 701 F.3d 156

2    (4th Cir. 2012), that I'd impose the same sentence as an

3    alternative variant sentence if I have miscalculated the

4    advisory guideline range.

5              This is the sentence that is sufficient but not

6    greater than necessary for Shamieka Goodall.

7              Ms. Goodall, you can appeal your conviction if you

8    believe that your conviction was somehow unlawful or if there's

9    some other fundamental defect in the proceeding.

10              You also have a statutory right to appeal your

11    sentence under certain circumstances, particularly if you think

12    your sentence is contrary to law.

13              With few exceptions, any Notice of Appeal must be

14    filed within 14 days of the judgment being entered on the

15    docket in your case.

16              If you're unable to pay the cost of an appeal, you

17    may apply for leave to appeal in forma pauperis.

18              If you so request, the Clerk of Court will prepare

19    and file a Notice of Appeal on your behalf.

20              Mr. Chetson, I think I made all the recommendations

21    you asked for.  Were there any others?

22              MR. CHETSON:  No, Your Honor.

23              THE COURT:  Anything else from the United States?

24              MR. DUFFY:  No, Your Honor.

25              THE COURT:  I thank counsel for their work here

1   today.  That will conclude the matter with Ms. Goodall.

2           (The proceedings were recessed at 10:48 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               UNITED STATE DISTRICT COURT

2           EASTERN DISTRICT OF NORTH CAROLINA

3

4

5             CERTIFICATE OF OFFICIAL REPORTER

6  I, Amy M. Condon, RPR, CSR, Federal Official Court Reporter, in

7  and for the United States District Court for the Eastern

8  District of North Carolina, do hereby certify that pursuant to

9  Section 753, Title 28, United States Code, that the foregoing

10  is a true and correct transcript of the stenographically

11  reported proceedings held in the above-entitled matter and that

12  the transcript page format is in conformance with the

13  regulations of the Judicial Conference of the United States.

14

15  Dated this 6th day of October, 2017.

16

17

                         /s/ Amy M. Condon

18                      Amy M. Condon, CSR, RPR
                         U.S. Official Court Reporter

19

20

21

22

23

24

25